[Cite as *In re X.M.W.*, 2020-Ohio-449.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: X.M.W. AND E.A.W.

:

:

:

:

APPEAL NOS. C-190568
C-190595
TRIAL NO. F13-1609X

*O P I N I O N.*

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: February 12, 2020

*Constance Murdock*, for Appellant Father,

*Geoffrey W. Pittman*, for Appellant Mother,

*Paul Hunt*, Attorney Guardian ad Litem for X.M.W. and E.A.W.,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Nick Gramke*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**BERGERON, Judge.**

{¶1} Mother and Father appeal the termination of their parental rights over their two young children. Our thorough review of the record, however, convinces us that clear and convincing evidence exists supporting the juvenile court's decision, including chronic substance abuse problems, a lack of concern or understanding over one of the child's serious medical issues, and a failure to make reasonable progress with their case plans, among other matters. We accordingly affirm the trial court's decision.

I.

{¶2} Mother and Father are the parents of two young children: daughter, X.M.W., born in October 2015, and son, E.A.W., born in November 2016. The Hamilton County Department of Job and Family Services ("HCJFS") entered the scene shortly after the daughter's birth when Mother tested positive for benzodiazepines (for which she admittedly did not have a prescription).[1] Hoping that Mother would engage in offered substance abuse services, HCJFS allowed X.M.W. to remain in Mother's care. But as time passed, concerns grew regarding Mother's inability to properly engage in services to remedy her drug use, which eventually prompted the agency to move for interim temporary custody of her daughter (granted by the court in May 2016).

{¶3} A few months later, in November 2016, Mother gave birth to E.A.W., who tested positive for benzodiazepines at birth and required treatment at the hospital for withdrawal symptoms. In the wake of this development, HCJFS moved for interim temporary custody of him, which the court granted in December 2016.

---

[1] "Sometimes called 'benzos,' these are sedatives often used to treat anxiety, insomnia, and other conditions." Centers for Disease Control and Prevention, *Opiod Overdose: Commonly Used Terms*, https://www.cdc.gov/drugoverdose/opioids/terms.html (accessed Jan. 27, 2020).

E.A.W. was also born with clubfeet, which required ongoing medical treatments, and later developed asthma and eye problems, prompting more medical care. Interim custody eventually evolved into HCJFS securing temporary custody of both children.

{¶4} With the children in the temporary custody of HCJFS, both Mother and Father received court-ordered case plans as part of the effort to eventually reunite their family. Mother, mired in ongoing substance abuse struggles, was to participate in services to address her substance abuse and to submit to drug screens. Father's case plan included engaging in services to gain a fuller understanding of Mother's substance abuse issues and to also submit to periodic drug screens. Both parents were also to attend medical appointments regarding their son's clubfeet.

{¶5} As time passed without material improvements, HCJFS eventually moved for modification of temporary custody to permanent custody pursuant to R.C. 2151.413. After a hearing on the matter, and citing concerns with both parents' inability to successfully complete case plan services, continued positive drug screens, and overall lack of participation concerning E.A.W.'s healthcare, the magistrate determined that a grant of permanent custody to HCJFS was in both children's best interests.

{¶6} Mother and Father lodged objections to that decision, challenging it before the juvenile court. The juvenile court ultimately adopted the decision of the magistrate and granted permanent custody to HCJFS of both children. That decision precipitated this appeal, in which both parents now contest the decision terminating their parental rights. In her sole assignment of error, Mother challenges both the weight and sufficiency of the evidence, positing that the juvenile court's decision was not supported by clear and convincing evidence. Similarly, Father, in his sole assignment of error, contends the juvenile court's decision was not supported by the

requisite clear and convincing evidence required for a grant of permanent custody to HCJFS. We consider both challenges together in this opinion.

II.

{¶7} Because parents have a paramount right to the custody of their children, the juvenile court's determination to grant permanent custody to HCJFS must be supported by "clear and convincing" evidence. *In re A.M.Z.*, 1st Dist. Hamilton Nos. C-190292, C-190317 and C-190326, 2019-Ohio-3499, ¶ 5. Clear and convincing evidence is sufficient evidence to " 'produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.' " *In re L.D.*, 1st Dist. Hamilton No. C-190470, 2019-Ohio-4990, ¶ 4, quoting *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46.

{¶8} Reviewing the sufficiency of the evidence requires determining "whether some evidence exists on each element. It is a test for adequacy, and is a question of law." *In re P.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 7. As to a challenge to the weight of the evidence, "we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the [juvenile] court clearly lost its way and created * * * a manifest miscarriage of justice" warranting reversal. *In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 16.

{¶9} In determining the propriety of a grant permanent custody, the child's best interest governs the juvenile court's analysis. *In re C.L.*, 1st Dist. Hamilton No. C-170169, 2017-Ohio-7184, ¶ 17 ("In a custody determination, the best interest of the child controls."). Therefore, whether a grant of permanent custody is appropriate requires satisfying the two-part test established by R.C. 2151.414(B)(1). *In re A.M.Z.* at ¶ 5. Under R.C. 2151.414(B)(1), clear and convincing evidence must demonstrate

that (1) the grant of permanent custody is in the child's best interest and (2) that one of the factors under R.C. 2151.414(B)(1)(a) through (e) is also met. *See* R.C. 2151.414 (B)(1) and (D)(1); *In re M.*, 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, ¶ 17 (noting that R.C. 2151.414(B) requires permanent custody be in the child's best interest and that one of the five conditions under R.C. 2151.414(B)(1) be satisfied).

{¶10} As an initial matter, regarding the requisite R.C. 2151.414(B)(1)(a) through (e) finding, we note that both Mother and Father concede that R.C. 2151.414(B)(1)(d) (the so-called "12 of 22" factor) is satisfied in this case. R.C. 2151.414(B)(1)(d) involves a finding by the juvenile court that the "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period[.]" For purposes of calculating this time, R.C. 2151.413(D)(1) explains that this period runs from the earlier of the date that the child was adjudicated dependent or 60 days from the date that the child was removed from the home. The earlier date for both children in this case was 60 days after the date they were removed from the home, i.e., 60 days after the date on which HCJFS received interim temporary custody. For X.M.W., that was July 4, 2016, and for E.A.W., February 27, 2017. Therefore, at the time that HCJFS moved for permanent custody in April 2018, the children had resided in the temporary care of the agency for approximately 21 and 14 continuous months respectively. *See In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26 (noting that the 12 months must accrue before an agency can move for permanent custody).

{¶11} Mother and Father both contest the additional R.C. 2151.414(B)(1)(a) finding, which requires a determination that the child cannot be placed within a reasonable time or should not be placed with the parents. R.C. 2151.414(B)(1),

however, only requires that "any" of the (a) through (e) factors exist, rendering any finding under (B)(1)(a) superfluous in light of the R.C. 2151.414(B)(1)(d) conclusion. *In re S.W.*, 3d Dist. Marion Nos. 9-18-29 and 9-18-30, 2019-Ohio-2068, ¶ 19 (noting that each finding under R.C. 2151.414(B)(1) is an alternate finding and each is independently a sufficient basis to support a motion for permanent custody). As the parents concede the appropriateness of the R.C. 2151.414(B)(1)(d) finding, the crux of their respective challenges therefore turns on the juvenile court's best interest determination pursuant to R.C. 2151.414(D).

{¶12} R.C. 2151.414(D)(1) explains that, in considering a child's best interest, a court must consider all relevant factors including those enumerated in (D)(1)(a) through (e). In conducting the best interest analysis "[n]o single factor is given greater weight or heightened significance." *In re P.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, at ¶ 35, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶13} The first factor, R.C. 2151.414(D)(1)(a), addresses the "interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[.]" Mother protests that the juvenile court did not fully appreciate the bond that both children share with Mother and Father in its determination. But the juvenile court noted the consistency of the parents' visitation with the children and both parents' testimony reflected that they derived great enjoyment from being with their children. Thus, while we do not doubt the existence of a bond between the parents and their children, nor the sincerity of their desire to receive custody, the juvenile court detailed countervailing evidence on this point, as noted below.

{¶14} Neither child resided long (if at all) in the parents' care—X.M.W. only for few months, and E.A.W. not at all. In their foster care environments, both children developed strong bonds with their foster parents, who ultimately wish to adopt them. Testimony from each child's respective foster parent established their relationships with each of their foster families. Both children had resided with the same families since being placed in the agency's care nearly two years prior.

{¶15} E.A.W.'s foster parents ensured that he was getting the appropriate medical care that he needed, whereas neither Mother nor Father consistently attended or participated in doctor's appointments related to his various health issues. Testimony from E.A.W.'s foster mother indicated that in the approximately two years since birth, he attended 105 medical appointments, of which Mother was present for approximately six. As explanation for her absences, Mother cited difficulty in receiving notice and failure of HCJFS to provide transportation to medical appointments. Mother's caseworker did acknowledge one occasion on which Mother received only a day's notice of an appointment, but otherwise explained that the agency provided timely notice of the appointments, as well as offering gas cards and bus passes for transportation. In response to his absence at medical appointments, Father testified he relied on Mother to attend the visits because of his work schedule. Both parents harbored doubts about the validity of E.A.W.'s medical issues, in particular his asthma diagnosis, raising concerns about whether they would actually ensure that he received appropriate medical treatment.

{¶16} The juvenile court also took into account the wishes of the children, through the position of the children's guardian ad litem ("GAL"), who supported a grant of permanent custody to HCJFS. *See* R.C. 2151.414(D)(1)(b) (requiring the court to consider the child's wishes). The GAL emphasized the parents' lack of

7

appreciation for the substance abuse issues and the fact that if the children were returned to the parents the practical effect would be that they would be left solely in Mother's care. The GAL also voiced concerns regarding the detrimental effect such a move would have on the children.

{¶17} Considering the custodial history of the children pursuant to R.C. 2151.414(D)(1)(c), the juvenile court found that the children were in the temporary custody of HCJFS for over 12 months of a consecutive 22-month period, which as discussed above, was adequately supported by the record. Further probative of this issue, the children had spent no appreciable time living with the parents—for nearly their entire lives (and for the son, for his entire life) they resided with foster families with whom (as noted above) they had bonded.

{¶18} Turning to R.C. 2151.414(D)(1)(d), which concerns "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to [HCJFS]," the juvenile court essentially concluded that neither parent could adequately care for the children, requiring a legally secure placement with HCJFS, particularly citing Mother's ongoing substance abuse issues and Father's inability to shield the children from Mother's substance abuse. A survey of the record at hand supports this conclusion. Moreover, the inability or unwillingness of the parents to adequately respond to the medical needs of their son further supports the juvenile court's conclusion. He is entitled to live in a safe environment with adequate medical care.

{¶19} Both parents were afforded multiple opportunities to demonstrate progress with their case plans, but they regrettably fell short. At the time of trial, neither parent had successfully completed their ordered case plan services. Both Mother and Father were also refusing to participate in further drug screens, as

8

neither parent believed that successful screens would help achieve reunification with the children. As to the few screens that they did submit to, both parents tested positive for drugs. The guardian ad litem tendered several of Mother's screens as exhibits which showed positive results for marijuana and benzodiazepines. Of the four screens Father participated in, one was positive for marijuana.

{¶20} Despite ongoing positive drug screens and the removal of her children due to substance abuse concerns in 2016, Mother considers herself to be 11-years sober (calculating her sobriety from the date she last used heroin, and minimizing the lingering issues with marijuana and prescription drugs). Mother admitted to using benzodiazepines without a prescription, but did not recall testing positive for the drug in 2018. Turning a blind eye to the results of her drug screens, Mother insisted that she no longer has a drug problem, which the juvenile court could certainly have taken into account in assessing her credibility.

{¶21} Father likewise counterfactually conveyed his conclusion that Mother's drug usage and substance abuse problems were behind her, and that the children would be fine left in her care while he was at work, essentially defying aspects of his case plan obligating him to recognize and appreciate Mother's substance abuse issues. Underscoring the point, Father later admitted that he was unable to tell when Mother was using and that perhaps she was not fully compliant with her treatment yet. Though at the time of the custody hearing Mother and Father no longer lived together, Father admitted this was orchestrated largely as a tactical move, as they believed that the court would look more favorably on their case if Mother no longer lived with Father. Father claimed the two still planned to marry.

9

{¶22} As to the last enumerated factor, R.C. 2151.414(D)(1)(e) points the court to consider whether any factor listed in R.C. 2151.414(E)(7) through (11) applies. These were inapplicable in the case at hand.

{¶23} Based on the foregoing, the record reflects that the juvenile court's decision was supported by both the sufficiency and weight of the evidence. Moreover, the record demonstrates that the juvenile court engaged in proper consideration of the relevant statutory factors, finding by clear and convincing evidence that the grant of permanent custody was in the children's best interest.

III.

{¶24} While we appreciate the seriousness of the decision to terminate Mother's and Father's parental rights, the record supports the juvenile court's conclusions. Therefore, we accordingly overrule both Mother's sole assignment of error and Father's sole assignment of error. The judgment of the juvenile court is affirmed.

Judgment affirmed.

**MOCK, P.J.,** and **ZAYAS, J.,** concur.

Please note:
The court has recorded its own entry this date.